UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TD BANKNORTH INSURANCE AGENCY, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. _____ |
| CRAIG H. MEEKER, SMITH BROTHERS INSURANCE, INC., and DANIELLE BECHARD, | ) ) ) ) | |
| Defendants. | ) ) | NOVEMBER 2, 2007 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff TD Banknorth Insurance Agency, Inc. ("TDBIA" or the "Company"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, respectfully requests that the Court grant a temporary restraining order and preliminary injunction against Defendants Craig H. Meeker ("Meeker"), Smith Brothers Insurance, Inc. ("Smith Bros."), and Danielle Bechard ("Bechard") (collectively the "Defendants") in the form of the proposed order submitted herewith for all the reasons set forth below.

### INTRODUCTION

TDBIA seeks to enforce promises made by Meeker and memorialized in a written Non-Solicitation and Confidentiality Agreement between Meeker and TDBIA dated July 5, 2007 (the "Agreement).[1]  Meeker breached and continues to breach the Agreement and to violate applicable Connecticut law by soliciting customers of TDBIA, by misappropriating TDBIA's confidential information and trade secrets, and by soliciting and recruiting employees of the

---

[1]  Meeker initially entered into a Non-Solicitation and Confidentiality Agreement, dated December 1, 2003, at the time he commenced employment with TDBIA, the terms of which are substantially the same as Meeker's 2007 Agreement.

Company.  Meeker committed breaches of the Agreement and violations of applicable Connecticut law for his own benefit and for the benefit of his current employer, Smith Bros. Smith Bros. has accepted and retained those benefits with full knowledge that they derive from Meeker's misconduct.  In addition, Meeker misappropriated and forwarded to Bechard TDBIA's confidential and proprietary information, which Meeker and Bechard have failed and refused to return to TDBIA.

TDBIA also seeks to enforce promises made by Bechard and memorialized in a written Code of Conduct and Ethics (the "Code of Conduct"), including a covenant that she would safeguard and not disclose all of TDBIA's confidential information and trade secrets.  Bechard and Meeker willfully breached and continue to breach the Code of Conduct and to violate applicable Connecticut law both during and after their employment with TDBIA by wrongfully using and misappropriating TDBIA's confidential information and trade secrets.

Prejudgment temporary and preliminary injunctive relief is appropriate and necessary to remedy the otherwise irreparable harm caused by Meeker's ongoing breaches of the confidentiality and non-solicitation provisions of his Agreement with TDBIA and Defendants' violations of the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. §§ 35-50, *et seq.*  Specifically, as set forth in more detail in the accompanying Motion and proposed Order, TDBIA seeks an order (a) restraining Defendants from using trade secrets and confidential and proprietary information that they misappropriated from TDBIA; (b) enjoining Defendants from using TDBIA's confidential and proprietary information to solicit TDBIA's clients, customers, accounts, and prospects; (c) enjoining Meeker from soliciting TDBIA's clients, customers, accounts, and prospects; and (d) compelling Defendants to return immediately to TDBIA any and all documents, records, and data in whatever form containing confidential and proprietary information and trade secrets that they misappropriated from TDBIA.

2

# SUMMARY OF FACTS[2]

## I.   MEEKER WAS AN OFFICER AND EMPLOYEE OF TDBIA WITH KEY RESPONSIBILITY FOR THE RELATIONSHIPS BETWEEN TDBIA'S BOND DIVISION AND ITS CUSTOMERS

TDBIA is engaged in the competitive business of selling and marketing surety bonds, insurance, and related products and services. The sale of these products and services constitutes the primary source of TDBIA's revenue. TDBIA employs, trusts, and relies upon its agents and officers to sell surety bonds and services to its customers. Meeker, who served as Vice President and Business Development Producer, was one of those key employees. He had the responsibility to develop new customers of surety bonds and related products and services and to retain and to expand business with existing TDBIA customers. Meeker sold and promoted the sale of surety bonds and related products and services to TDBIA customers, solicited new customers of TDBIA, and provided services to existing TDBIA customers. TDBIA compensated Meeker for developing business relationships and for otherwise generating good will on behalf of TDBIA. Peterson Aff. ¶¶ 5 – 7.

Meeker worked as an underwriter in the insurance business before undertaking employment with TDBIA in November 2003. In his former position, Meeker did not have responsibility for marketing surety bonds, soliciting customers, or otherwise producing business through the sale of surety bonds or related products or services. Consequently, Meeker did not have a "book of business" or existing clientele at the time that he started employment with TDBIA, and TDBIA provided him with what he needed to succeed in his new position. To enable Meeker to form business relationships with customers and to otherwise generate good will on behalf of TDBIA, the Company gave him access to confidential and proprietary

---

[2] The facts supporting this motion are set forth in detail in the Affidavit of Peter E. Peterson ("Peterson Affidavit" or "Peterson Aff.") and the Affidavit of Joan Kirby ("Kirby Aff.") in support of TDBIA's motion, which are incorporated herein by reference.

information, including customer lists and account information, strategic business plans, customer loss information, budgetary and financial information, rate and pricing structures, and other confidential and proprietary information ("Confidential and Proprietary Information").[3] Peterson Aff. ¶¶ 6 – 8.

The efforts taken by TDBIA to protect its Confidential and Proprietary Information reflect the value and importance of that information to TDBIA's operations and success. As a condition of employment with TDBIA when Meeker began working for the Company, Meeker entered into a non-solicitation and confidentiality agreement with the Company, which was named Morse, Payson & Noyes Insurance at the time, on December 1, 2003.[4] Subsequently, as a condition to continued employment, Meeker executed the updated, operative Agreement with terms that are substantially the same as the earlier version. Peterson Aff. ¶ 9. A true and correct copy of Meeker's Agreement with TDBIA is attached as Exhibit A to the Peterson Affidavit.

## II.   THE TERMS AND CONDITIONS OF MEEKER'S NON-SOLICITATION AND CONFIDENTIALITY OBLIGATIONS ARE CLEARLY SET FORTH IN HIS WRITTEN AGREEMENT WITH TDBIA

Meeker specifically acknowledged and agreed that the responsibilities of his position required TDBIA to trust him with client relationships and to share Confidential and Proprietary Information with him for the purpose of generating goodwill for and on behalf of TDBIA. The Agreement reads as follows:

> The parties agree that, during the course of [Meeker's] employment with the Company, (1) the Company has provided and/or will provide [Meeker] with access to, and substantial and close contact with, the Company's existing, prospective and/or potential clients, customers, and accounts (including clients, customers, and accounts with whom the Company has developed a close relationship and

---

[3] The Confidential and Proprietary Information to which Meeker had access is more fully defined and set forth in Meeker's Agreement as discussed below.

[4] Morse, Payson & Noyes (which also had a trade name of Banknorth Insurance Agency/CT when Meeker started employment) changed its name to TD Banknorth Insurance Agency, Inc., in May 2005.

significant goodwill); (2) [Meeker] has and/or will acquire Confidential and
Proprietary Information regarding the relationships between the Company and its
clients, customers and accounts; and (3) [Meeker], on behalf of and for the benefit
of the Company and at the Company's substantial expense, has developed and
maintained, and/or will develop and maintain, close and unique relationships and
significant goodwill with the Company's clients, customers, and accounts, including
clients, customers, and accounts with whom or with which [Meeker] had a
relationship prior to his/her employment with the Company.

Peterson Aff. ¶ 16; Agreement, p. 5, at ¶ 7.  Accordingly, to induce TDBIA to hire him and to

assure TDBIA that he could be trusted with the information and client relationships, Meeker

specifically promised:

> (1)    that "all insurance, surety and other types of bonds, self-insurance
> programs, consulting services, niche and association programs, financial services
> and products, employee benefit programs, and other related insurance and risk
> management products and services sold, handled, or performed by [Meeker] shall
> be sold, handled and performed solely for the account of, and on behalf of, the
> Company [TDBIA]," and "during and after the term of [Meeker's] employment,
> the Company shall have and control the exclusive right to renew, sell, and handle
> such insurance, products, and services";
>
> (2)    that "the Company is the sole owner of confidential and proprietary
> information relating to the Company's business with its customers and the
> Company's relationships and goodwill with its customers"; and
>
> (3)    that "the Company is the sole owner of any goodwill built-up or
> developed by [Meeker] through the [Meeker's] relationship with any of the
> Company's customers."

Peterson Aff. ¶ 11; Agreement, p. 3, at ¶¶ 3.A - 3.B.

Meeker's Agreement with TDBIA prohibits certain conduct on his part as reasonably

necessary to protect TDBIA's legitimate business interests.  Meeker promised that during the

term of his employment he would neither plan any business activity that would compete with

TDBIA, nor divert any business away from TDBIA.

> [Meeker] agrees that while employed by the Company, [he] will not, in any way,
> directly or indirectly, individually or on behalf of or in conjunction with any
> entity or person, plan, organize, participate or engage in any business activity that
> would compete with the Company or provide, offer or market services, or
> products similar to those services or products provided, offered or marketed by

ME1 6885073v.1

the Company.  [Meeker] acknowledges and agrees that violation of this provision is a material breach of this Agreement and of [Meeker's] duty of loyalty to the Company.

Peterson Aff. ¶ 15; Agreement, p. 4, at ¶ 6.  The prohibition against diversion of business reads as follows:

During the course of [Meeker's] employment with the Company, [Meeker] shall not, directly or indirectly, or through the use of a third party or entity, whether for [his] own benefit or account or for the benefit or account of any person or entity other than the Company, solicit, call upon, divert, attempt to divert, take away, attempt to take away, induce, or negotiate with any person, firm, corporation, or other entity who or which is or was doing business with the Company.

Peterson Aff. ¶ 17; Agreement, p. 5, at ¶ 7.C.   In addition, Meeker specifically promised that he would not solicit or induce other employees to leave TDBIA during the term of his employment and for a period of three years after termination of his employment:

During the course of [Meeker's] employment with the Company, and for a period of three years thereafter, [Meeker] promises and agrees to refrain from directly or indirectly soliciting, inducing, or recruiting, or attempting to solicit, induce or recruit, or causing others to solicit, induce or recruit, any employee of the Company to apply for or accept employment with any other person or entity in direct or indirect competition with the Company.

Peterson Aff. ¶ 21; Agreement, p. 6, at ¶ 8.

Furthermore, Meeker agreed to refrain from certain activities for a period of three years following the end of his employment relationship with TDBIA.  First, Meeker promised that he would not interfere or attempt to interfere with TDBIA's relationship with any of its customers or prospective customers:

For a period of three years after termination of [Meeker's] employment with the Company for whatever reason, [Meeker] shall not, directly or indirectly, or through the use of any other party or entity, whether on behalf of or in conjunction with any entity or person, and whether for his/her own benefit or account or for the benefit or account of any person or entity other than the Company, interfere or attempt to interfere with the relationship of the Company with any existing client, customer, or account or any prospective client, customer, or account.

ME1 6885073v.1

Peterson Aff. ¶ 18; Agreement, p. 5, at ¶ 7.D.  Second, Meeker promised not to solicit, contact, or

call any of TDBIA's customers or prospective customers for the purpose of selling or providing

insurance-related products or services:

> For a period of three years after termination of [Meeker's] employment with the
> Company for whatever reason, [Meeker] shall not, directly or indirectly, or
> through the use of any other party or entity, whether on behalf of or in conjunction
> with any entity or person, and whether for his/her own benefit or account or for the
> benefit or account of any person or entity other than the Company, solicit,
> contact, or call, or attempt to solicit, contact, or call, any existing client,
> customer, or account or any prospective client, customer, or account for the
> purpose of selling or providing any insurance-related services or products.

Peterson Aff. ¶ 19; Agreement, p. 6, at ¶ 7.E.  Meeker acknowledged and agreed that these

reasonable, limited restrictions (1) neither diminished his capacity to earn a living nor created an

unfair or undue hardship; and (2) induced TDBIA to enter into an employment relationship with

him.  Peterson Aff. ¶ 20; Agreement, p. 6, at ¶ 7.F.

In addition, Meeker agreed that he would maintain and protect the confidentiality of

TDBIA's Confidential and Proprietary Information at all times both during and after his

employment with TDBIA:

> [Meeker] agrees to maintain and ensure the strictest confidentiality of all
> Confidential and Proprietary Information at all times during and after his/her
> employment with the Company, and shall not, directly or indirectly, at any time
> during or after [his] employment with the Company (except as expressly
> authorized by the Company in conjunction with [Meeker's] work for the
> Company or as otherwise required by law), disclose, divulge or reveal the same
> to any entity or person or retain or use the same for [Meeker's] own or another
> entity's or person's gain or benefit.

Peterson Aff. ¶ 12; Agreement, p. 3, at ¶ 4.A.  "Confidential and Proprietary Information," as

defined by Meeker and TDBIA in the Agreement, includes:

> customer advertising, pricing and billing information, including but not limited to
> names of customers, customer contacts, policy expiration dates, policy terms,
> familiarity with customer's risk characteristics, and information concerning the
> insurance markets for commercial risks including large or unusual commercial
> risks; customer practices, policies, and preferences; the Company's and

> [Meeker's] customer and prospect lists, including customer and prospective customer identities, contacts, and information; the Company's billing practices, marketing plans or proposals or strategies, promotional plans or proposals or strategies, financial records and information, business forecasts or plans, contracts and contractual forms; all renewal information and expiration dates for policies and other products; and other such information which relates to the Company's business, which is not available generally to the public and which has been developed or acquired by the Company with considerable effort and expense.

Peterson Aff. ¶ 13; Agreement, pp. 3-4, at ¶ 4.B.  Meeker promised TDBIA that he would return all of TDBIA's Confidential and Proprietary Information immediately upon termination of his employment. Peterson Aff. ¶ 14; Agreement, p. 4, at ¶ 5.

Finally, Meeker agreed that the restrictive covenants to which he bound himself in the Agreement are reasonable in scope and duration and extend only so far as necessary to protect the Company's assets and interests against unfair competition:

> [Meeker] agrees that the restrictions imposed by paragraphs 3 through 9 of this Agreement are reasonable with respect to the Company's protected and protectible business interests, the Company's Confidential and Proprietary Information, and the time period covered, and that [Meeker's] compliance with such covenants and restrictions is necessary to protect the business and goodwill and other legitimate proprietary interests of the Company, and that the level of compensation set forth in this Agreement has been calculated to include amounts sufficient to constitute adequate consideration both for the employment services to be rendered to the Company by [Meeker] and for [Meeker's] compliance with the foregoing covenants and restrictions.

Peterson Aff. ¶ 22; Agreement, p. 7, at ¶ 10.  Meeker specifically agreed that any breach of the Agreement by him would entitle TDBIA to "immediate temporary, preliminary and permanent injunctive relief by any court of competent jurisdiction, without bond, to enforce the terms of this Agreement and to enjoin [Meeker] from continuing or commencing any activity which would violate any of the covenants and restrictions [of the Agreement]." *Id.*

8

### III.   MEEKER MISAPPROPRIATED TDBIA'S CONFIDENTIAL AND PROPRIETARY INFORMATION, WRONGFULLY SOLICITED TDBIA'S CUSTOMERS, AND INDUCED OTHER EMPLOYEES TO LEAVE TDBIA

Meeker unexpectedly submitted a written notice of resignation to his supervisor, Peter

Peterson, on October 22, 2007.  In his notice, Meeker wrote that he was providing two weeks

notice and added, "I will understand if you want me to leave sooner."  Meeker also wrote, "Per

the terms of my non-compete [sic] agreement, attached is a list of accounts that I would like to

purchase."  Meeker attached to his notice of resignation a list of 57 accounts that he purportedly

wanted to "purchase" under the terms of his Agreement.  He reported to Mr. Peterson that he was

quitting his job at TDBIA to take a similar position at Smith Bros., a direct competitor of TDBIA

that is engaged in the business of selling surety bonds and related products and services.  TDBIA

has not at any time waived any of its rights under Meeker's Agreement or agreed that Meeker

could in any way "purchase" any of TDBIA's accounts.  Upon receipt of Meeker's notice of

resignation, TDBIA terminated Meeker's employment effective as of October 22, 2007.

Peterson Aff. ¶ 23.

On October 22, 2007, the *same day* that Meeker submitted his resignation, several of

TDBIA's bond customers delivered "Broker of Record" letters by which they directed

underwriters of surety bonds to recognize Smith Bros. – and to remove TDBIA – as their broker

of surety bonds.  Many of these letters are the same in form and content even though they appear

under the customers' differing letterheads.  The timing, form, and content of the Broker of

Record letters leave no doubt that Meeker planned and worked with TDBIA's customers to

prepare the Broker of Record letters while he was still employed by TDBIA and/or that Meeker

misappropriated TDBIA's Confidential and Proprietary Information to prepare the letters both

during and after his employment with TDBIA.  TDBIA received additional Broker of Record

letters from other customers later in the same week; and, as of the filing of TDBIA's Complaint

9

ME1 6885073v.1

and demand for injunctive relief, Meeker has solicited and induced more than 30 separate customers to leave TDBIA and move their business to Smith Bros., amounting to lost annual revenue in excess of $250,000.00 and unknown lost goodwill and future revenue.  Peterson Aff. ¶¶ 27 – 28.

After Meeker resigned his employment, TDBIA's Information Technology Department examined TDBIA's computer systems to ascertain Meeker's activities during the period preceding his resignation.  Joan Kirby, TDBIA's Technical Documentation & Project Specialist, discovered that Meeker, while still employed by TDBIA and in violation of TDBIA's policies, sent at least three emails with attachments from his Company email account to the home email account of Bechard, the TDBIA customer service representative whom he supervised.  Peterson Aff. ¶ 24; Kirby Aff. ¶¶ 2 – 4.  As discussed below, Meeker solicited both Bechard and another TDBIA employee, administrative assistant Erin Bennett ("Bennett"), to leave their employment with TDBIA and accompany him to Smith Bros.

The attachments that Meeker emailed to Bechard's home email account consisted of Excel spreadsheets and a Company Bond Request Form.  The Excel spreadsheets included (1) a spreadsheet entitled "CT Target List" that consisted of 574 separate customer prospects compiled by TDBIA, with contact information, business type, bonding agent information and information regarding whether the prospect had been talked or written to by TDBIA; and (2) various spreadsheets that included up to 63 contractor accounts of TDBIA's bond department, including customer contact information, the name and title of the business principal and company contact, and the bond underwriter contact information.  Peterson Aff. ¶ 25.

The attachments sent by Meeker contain highly confidential and proprietary information of TDBIA including, but not limited to, customer names and contact information.  In short, Meeker misappropriated and took for his benefit and the benefit of his new employer, Smith

10

Bros., TDBIA's Confidential and Proprietary Information necessary to provide surety bonds and other insurance-related services and products to TDBIA's customers and prospects. The information taken by Meeker regarding these customers represents a substantial amount of work, input, research, and proprietary information that Defendants otherwise would not have access to, and which Defendants could use, and did use, to solicit business for their own benefit without having to go through the expense or resources to compile the information themselves. TDBIA protects its Confidential and Proprietary Information through the Agreement, the form of which all producers are required to execute, confidentiality policies and codes of conduct, and secure computer password policies and procedures which prohibit accessing and downloading TDBIA's Confidential and Proprietary Information, including customer contact information. Peterson Aff. ¶ 26.

On October 24, 2007, the second day after Meeker left TDBIA to work for Smith Bros., TDBIA learned from one of its customers that Meeker had initiated contact with the customer to inform the customer that he was leaving TDBIA to work for Smith Bros. There was no reason for Meeker to contact TDBIA's customer other than to encourage and to solicit the customer to transfer his business from TDBIA to Smith Bros. Peterson Aff. ¶ 29.

In addition, Meeker solicited and induced two TDBIA employees—customer service assistant Bechard and Bennett—to resign their employment with TDBIA and to undertake employment with him at Smith Bros. On October 22, 2007, the same day that Meeker announced his resignation, Bechard and Bennett provided notice that they intended to resign their employment with TDBIA and begin working with Meeker at Smith Bros. In fact, Meeker specifically informed Mr. Peterson that Bechard and Bennett were also resigning their employment with TDBIA. Bechard informed Mr. Peterson that Meeker told Bennett and her that it was up to them whether they wanted to leave TDBIA and go to work with him at Smith Bros.

11

It is clear, given this statement and the timing of Bechard's and Bennett's notice of resignation, that Meeker solicited them to go to work with him at Smith Bros. while Meeker was still employed by TDBIA.  Bechard resigned her employment with TDBIA effective as of October 24, 2007, and Bennett resigned her employment with TDBIA effective as of October 23, 2007. By soliciting the employment of Bechard and Bennett and taking them with him to Smith Bros., Meeker effectively wiped out TDBIA's entire bond department for Connecticut.  Peterson Aff. ¶ 30.

Despite the clear and reasonable covenants in the Agreement, it is clear that Meeker has blatantly violated and continues to violate the Agreement by misappropriating TDBIA's Confidential and Proprietary Information, by soliciting, selling to, and taking away TDBIA's customers and accounts, and by soliciting, inducing, and recruiting TDBIA's employees to leave their employment with the Company and to join Smith Bros.  TDBIA has written to Meeker, Bechard, and Smith Bros. demanding:  (1) that Meeker and Bechard immediately return to TDBIA, and maintain the confidentiality of, all of TDBIA's Confidential and Proprietary Information in their possession, custody, and control; (2) that Meeker immediately cease soliciting TDBIA's employees to leave their employment with the Company to join Smith Bros.; (3) that Meeker immediately cease soliciting, and interfering with TDBIA's relationship with, TDBIA's customers; and (4) that Smith Bros. take notice of Meeker's continuing obligations to the Company and take steps to avoid using and misappropriating the Company's Confidential and Proprietary Information and customer goodwill.  Defendants have ignored, and failed and refused to comply with, TDBIA's demands.  Peterson Aff. ¶¶ 31, 35.

12

## ARGUMENT

I.  **THE STANDARDS FOR ISSUANCE OR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ARE WELL SETTLED**

Under Connecticut law, "[t]he principal purpose of a temporary injunction is to preserve the *status quo* until the rights of the parties can be finally determined after a hearing on the merits." *Rustici v. Malloy*, 60 Conn. App. 47, 56, 758 A.2d 424, *cert. denied*, 254 Conn. 952, 762 A.2d 903 (2000); *see also Carvel Corp. v. DePaola*, No. CV000505443, 2001 Conn. Super. LEXIS 1190, at *6 (Conn. Super. Ct. Apr. 24, 2001) (granting temporary restraining order to enforce restrictive covenants). Similarly, Rule 65 permits the granting of a temporary restraining order for the "purpose of preserving the *status quo* and preventing irreparable harm." *Warner Brothers, Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1125 (2d Cir. 1989); *Pan American World Airways, Inc. v. Flight Engineers' Intern'l Ass'n*, 306 F.2d 840, 843 (2d Cir. 1962) ("The purpose of a temporary restraining order is to preserve an existing situation in *status quo* until the court has an opportunity to pass upon the merits of the demand for preliminary injunction").

The Second Circuit has established a standard for issuing a temporary restraining order that this District has applied on many occasions: "[A] plaintiff must show a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party." *Allied Office Supplies, Inc. v. Lewandowski*, 261 F. Supp.2d 107, 108 (D. Conn. 2003) (citing *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)). Courts consider the following factors when assessing an application for a temporary restraining order: "(1) the significance of the threat of irreparable harm to the plaintiff if the injunction is not granted; (2) the state of the balance between the aforementioned harm and the harm that granting the injunction would inflict on the opposing

13

party; (3) the probability that the plaintiff will succeed on the merits; and (4) the public interest."
*Phillip v. NCAA,* 960 F. Supp. 552, 554 (D. Conn. 1996) (citing 11 C. Wright & A. Miller,
*Federal Practice and Procedure* § 2948 (1969 & Supp. 1986)).

In the present case, as set forth below, TDBIA has demonstrated a likelihood of success
on the merits on its claims against Meeker for breach of contract and against Meeker, Bechard,
and Smith Bros. for violations of the Connecticut UTSA.  Further, given Defendants' ongoing
misappropriation of TDBIA's Confidential and Proprietary Information and trade secrets, and
their joint raid to solicit and divert TDBIA's customers, there is a threat of immediate,
irreparable injury to TDBIA.  The harm to TDBIA if the injunction is not granted certainly
outweighs any harm that Meeker, Bechard, and Smith Bros. might sustain as a result of
complying with their obligations under contract and statutory law.  Finally, an injunction will not
harm the public interest; in fact, the public interest will be served by preserving the
confidentiality of TDBIA's Confidential and Proprietary Information.

## II.   TDBIA IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON ITS CLAIMS AGAINST MEEKER FOR BREACH OF CONTRACT

### A.   The Restrictive Covenants Are Reasonable as a Matter of Law

It is well established under Connecticut law that an employer has an enforceable right to
protect its established business interests, including its customers, customer goodwill, and
confidential and proprietary business information.  As the Connecticut Supreme Court has
explained:

> We have stated that "[w]hen the character of the business and the nature of the
> employment are such that the employer requires protection for his established business
> against competitive activities by one who has become familiar with it through
> employment therein, restrictions are valid when they appear to be reasonably necessary
> for the fair protection of the employer's business or rights . . . .  Especially if the
> employment involves . . . [the employee's] contacts and associations with clients or
> customers it is appropriate to restrain the use, when the service is ended, of the knowledge

and acquaintance, so acquired, to injure or appropriate the business which the party was employed to maintain and enlarge."

*Robert s. Weiss & Assocs. v. Wiederlight*, 208 Conn. 525, 533 (1988) (quoting *May v. Young*, 125 Conn. 1, 6 – 7); *see also Minnesota Mining & Manufacturing Co. v. Francavilla*, 191 F. Supp. 2d 270, 279 (D. Conn. 2002); *United Rentals, Inc. v. Bastanzi*, 2005 U.S. Dist. LEXIS 45268, *21 - 24 (D. Conn. 2005). Courts specifically recognize that restrictive covenants legitimately serve to protect against the disclosure of confidential and proprietary information and trade secrets, which include customer lists and other compilations of information. *Robert S. Weiss*, 208 Conn. at 538; *Schumberger Tech. Corp. v. Frentrop,* 1981 U.S. Dist. LEXIS 10147, *13 – 17 (D. Conn. June 3, 1981) (granting preliminary injunction enjoining a former employee from violating the terms of a non-competition and confidentiality agreement after the defendant went to work for a competitor); *Newinno, Inc. v. Peregrim Dev., Inc.*, 2002 Conn. Super. LEXIS 3907.

The five factors to consider when evaluating the reasonableness of a restrictive covenant are (1) the length of time the restriction operates; (2) the geographic area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of the interference with the public's interest. *Minnesota Mining & Manufacturing Co.*, 191 F. Supp.2d at 279; *Robert S. Weiss & Assocs.*, 208 Conn. at 529. The restrictive covenants contained in the Agreement in this case are reasonable as a matter of law.

With respect to the first element, regarding the duration of the restrictions, Connecticut courts specifically have recognized the reasonableness of three year prohibitions barring insurance agents from soliciting their former employer's customers. *Hilb, Rogal & Hamilton Co. v. Pawlich*, 1995 Conn. Super. LEXIS 506, *19; *Nelson v. Evans, Shores  & Leonard*, 1995 Conn. Super. LEXIS 3483, *7. *See also Robert S. Weiss*, 208 Conn. 525, 530 – 31 (enforcing a

15

two year restriction on an insurance agent); *Schoonmaker v. Cummings & Lockwood of Conn.,
P.C.*, 252 Conn. 416 (2000) (holding that a three year restriction in a forfeiture upon competition
provision was valid); *Scott v. General Iron & Welding Co.*, 171 Conn. 132, 138 – 40 (1976)
(enforcing a five year restriction on competition).

    With respect to the second, third, and fourth elements—regarding the geographical
limitations, fairness, and extent of the restrictions—there are no geographical restrictions on
Meeker's post-employment activity, the restrictions are fairly designed to meet the legitimate
business interests of TDBIA, and Meeker is free to continue to work in his chosen profession, so
long as he refrains from soliciting TDBIA's customers and prospects and misappropriating
TDBIA's Confidential and Proprietary Information.  The Agreement contains no geographic
restriction on Meeker's post-employment activities; Meeker is free to work anywhere he pleases
so long as he refrains from breaching the restrictions set forth in the Agreement.  TDBIA does
not seek to enjoin Meeker from competing fairly by joining a competing agency; it seeks merely
to enjoin Meeker from violating the reasonable restrictions set forth in the Agreement.  *See
Robert S. Weiss*, 208 Conn. at 531 – 32 (explaining that prohibition on solicitation "by its own
terms did not protect the employer in areas where it did not do business"); *United Rentals, Inc.*,
2005 U.S. Dist. LEXIS 45268 at *22 - 24 (granting preliminary injunction and holding that
restrictive covenants were reasonable and fair given employer's legitimate interests and former
employee's ability to continue to earn a living); *Edge Technology Services, Inc. v. Worley*, 2005
Conn. Super. LEXIS 1804, *23 – 24 (granting preliminary injunction prohibiting former
employee from performing services for customers of employer).

    With respect to the fifth element, regarding interference with the public interest, the
restrictions do not interfere with the public's interest because they do not impede fair
competition.  On the contrary, the restrictions serve only to prevent Meeker from

misappropriating TDBIA's customer goodwill—which the Company paid Meeker to generate on

its behalf—and from misappropriating TDBIA's Confidential and Proprietary Information.

Enforcement of these reasonable restrictions serves, rather than hinders, the public's interest.

*See Scott*, 171 Conn. at 137.

**B.      The Record Evidence Shows a Likelihood of Success on TDBIA's Claims
         Against Meeker for Breach of the Agreement**

As set forth in detail above and in the Peterson Affidavit, it is clear that Meeker has

breached and continues to breach the Agreement by, *inter alia*, soliciting TDBIA's customers,

misappropriating Confidential and Proprietary Information, and soliciting TDBIA's Employees.

Meeker expressly acknowledged and agreed that TDBIA provided him with access to,

and close contact with, TDBIA's customers for the purpose of fostering good will *on behalf of

and for the benefit of TDBIA*.  Meeker has usurped those relationships and good will for himself

and for the benefit of his new employer in complete disregard for his obligations to TDBIA.

Meeker agreed that he would not, during his employment and for a three-year period afterwards,

(1) divert or take away, or attempt to divert or take away, TDBIA's existing or prospective

clients, customers, or accounts; (2) interfere or attempt to interfere with TDBIA's relationship

with its clients, customers, or accounts; or (3) solicit or attempt to solicit business from TDBIA's

customers.  He also promised that during the term of his employment he would neither plan any

business activity that would compete with TDBIA nor divert any business away from TDBIA.

The record evidence demonstrates conclusively that Meeker breached the unequivocal

terms of the non-solicitation provisions in his Agreement.  He began soliciting TDBIA's

customers—using Confidential and Proprietary Information that he misappropriated from

TDBIA—even before his employment with TDBIA ended.  Meeker has continued to solicit

TDBIA's customers and prospects since he resigned his employment.  To date, TDBIA has

17

received over 30 Broker of Record letters, in almost identical form, indicating that the customer has elected to transfer its bond business to Smith Bros.  It is clear that Meeker breached the Agreement by soliciting these customers and providing them with form letters to transfer their bond business to Smith Bros.

In addition, it is clear that Meeker breached his Agreement by misappropriating TDBIA's Confidential and Proprietary Information.  The full extent of Meeker's misappropriation and use of TDBIA's Confidential and Proprietary Information will not be revealed until discovery is underway.  Still, even at this stage of the litigation, the record evidence shows a likelihood of success on this claim:  Meeker used his email account at TDBIA to access, download, and forward to Bechard's home email account highly sensitive and valuable customer and prospect account and contact information.

Finally, Meeker has breached the Agreement by soliciting, inducing, or recruiting Bechard and Bennett to leave their employment with TDBIA and join him at Smith Bros.  In so doing, he has effectively usurped and decimated TDBIA's entire bond department in Connecticut.

### C.   Meeker's Ongoing Breaches of the Agreement Will Irreparably Harm TDBIA Unless the Court Grants Temporary and Preliminary Injunctive Relief

"Irreparable harm" means an injury that a monetary award cannot adequately compensate. *Minnesota Mining and Mfg. Co.*, 191 F. Supp.2d 270, 277 (D. Conn. 2002).  It is clear that the loss of customer goodwill and confidential or proprietary information is the type of injury that cannot be measured in monetary terms. *Id.* at 278; *Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp.2d 420, 423 (D. Conn. 2004).  Meeker's misconduct has severely undermined the goodwill that TDBIA has generated with its customers and, if allowed to continue, will cause irreparable harm to TDBIA's relationship with its customers.  Additionally,

18

as a broker of surety bonds and related financial services, TDBIA's ability to ensure the security

and integrity of its customers' confidential and financial information, something that is critical to

TDBIA's reputation and success.

Permitting Meeker to continue with and to benefit from (1) his misappropriation of

TDBIA's Confidential and Proprietary Information, (2) his wrongful solicitation of TDBIA's

customers, and (3) his recruitment of other TDBIA employees to work for Smith Bros. will

irreparably harm TDBIA's reputation and goodwill with its customers and in the industry.  *See,*

*e.g., Minnesota Mining & Manufacturing*, 191 F. Supp. 2d at 277 (holding that disclosure of

confidential information resulted in irreparable harm); *Branson Ultrasonics Corp. v. Stratman*,

921 F. Supp. 909, 913 (D. Conn. 1996) (granting injunctive relief and holding that loss of trade

secrets is not measurable in money damages); *Hart, Nininger, Campbell Assoc. v. Rogers*, 16

Conn. App. 619, 548 A.2d 758, 766 (1988) (holding that irreparable harm arises from

defendants' wrongful use of confidential information); *Elizabeth Grady Face First, Inc.*, 321 F.

Supp. 2d at 423 (a former employee's solicitation of customers that threatens to diminish former

employer's customer base and decrease good will "cannot be repaired with money"); *Jacobson*

*& Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 444-445 (2d Cir. 1977) (evidence of

threatened loss of goodwill and customers supports finding of irreparable harm).

The success of TDBIA's business depends upon maintaining the confidentiality of its

Confidential and Proprietary Information and its proprietary interest in its customer goodwill,

customer identities, customer account information, financial information, marketing strategies,

and other confidential business information, and upon retaining its employees in whom it has

invested substantial time and resources in training and developing customer relationships and

goodwill.  Unless the Court grants injunctive relief, Meeker will be able to derive—and to share

with his new employer, Smith Bros.—an unfair economic benefit from use and misappropriation

of TDBIA's Confidential and Proprietary Information and other proprietary interests and from

Meeker's recruitment of TDBIA employees in violation of the Agreement and applicable

Connecticut law.  Defendants will have the advantage of free access to TDBIA's Confidential

and Proprietary Information without the need to expend the time, resources, and efforts to

assemble the material themselves.  In addition, Defendants will be able to rely on the goodwill

and customer relations that TDBIA paid Meeker to foster and which he agreed not to

misappropriate for his own benefit.  Moreover, as a result of Meeker's recruitment of TDBIA's

employees, Defendants will have the benefit of the Company's investment of time and money in

training these individuals in its business and in developing customer relationships and goodwill.

Peterson Aff. ¶¶ 32 – 37.  The Court should not reward Defendants for their refusal to comply

with the terms of Meeker's Agreement and with applicable Connecticut law.

> **D.      TDBIA Will Suffer More from the Denial of Temporary and Preliminary
>          Injunctive Relief than Meeker Would Suffer if Relief is Granted**

As described in detail above, if Meeker is not enjoined from using and retaining

TDBIA's Confidential and Proprietary Information and soliciting TDBIA's customers, TDBIA

will face the loss of its clients' trust in its ability to keep confidential their personal and financial

information and records, and TDBIA will suffer irreparable harm to its relationships and

goodwill with its customers.  TDBIA has no ability to monitor Meeker's activities or how he has

misused and will misuse the Confidential and Proprietary Information he misappropriated from

TDBIA.  The receipt of Broker of Record letters and calls from clients leave no doubt that

Meeker, acting for his own benefit and as an agent on behalf of Smith Bros., has been actively

soliciting TDBIA's customers and using the Confidential and Proprietary Information to

persuade them to transfer their business to Smith Bros.

Meeker has no right to possess, retain, or use TDBIA's Confidential and Proprietary Information, and, therefore, he would not suffer any undue harm if the Court were to grant injunctive relief.[5]   Furthermore, TDBIA does not seek to prohibit Meeker from lawfully competing against it or from working for a competitor.  TDBIA seeks only (1) to regain possession of the Confidential and Proprietary Information Meeker has misappropriated; (2) to prevent Meeker from wrongfully using such information (including using the information to solicit TDBIA's customers and prospects or otherwise gain an unfair advantage in competing with TDBIA); (3) to stop Meeker's solicitation of TDBIA's customers and prospects in violation of his contractual obligations; and (4) to preclude Meeker's recruitment of other TDBIA employees to leave TDBIA and to work for Smith Bros.

**E.     Granting Temporary and Preliminary Injunctive Relief to Remedy Meeker's Ongoing Breaches of Contract Does Not Harm the Public Interest**

Granting injunctive relief under the circumstances of this case would not cause harm to the public interest.   In fact, just the opposite is true, and granting injunctive relief to TDBIA will protect an important public interest.  Specifically, in this day of identity theft and well-publicized breaches of confidentiality of consumer information, it certainly is in the public interest to strictly enforce and protect the confidentiality of confidential and proprietary and financial consumer information.  In addition, requiring Meeker to comply with his contractual obligations and applicable law is perfectly consistent with the public interest.  As discussed above, the Agreement serves public policy because it goes only so far as necessary to protect TDBIA's legitimate business interests.

---

[5]  Moreover, as noted, Meeker specifically agreed that enforcement of the non-solicitation provision of the Agreement "will not diminish his/her ability to earn a livelihood or create or impose upon him/her any unfair or undue hardship."

### III.   TDBIA IS ENTITLED TO A TEMPORARY AND PRELIMINARY INJUNCTION AGAINST MEEKER , BECHARD AND SMITH BROS. TO REMEDY THEIR VIOLATIONS OF THE CONNECTICUT UNIFORM TRADE SECRETS ACT.

The record evidence shows a likelihood of success on TDBIA's claims against Meeker,

Bechard, and Smith Bros. for violation of the Uniform Trade Secrets Act, Conn. Gen. Stat. §§

35-50, *et seq.*  The Connecticut Uniform Trade Secrets Act provides for injunctive relief as the

appropriate remedy for misappropriation of trade secrets independent of the standards developed

by the courts in the exercise of their inherent equitable powers.  CUTSA defines "trade secret"

as:

> [I]nformation, including a formula, pattern, **compilation**, program, device, method, technique, process, drawing, cost data or **customer list** that:  (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 35-51(d) (emphasis added).  Courts often look to the factors set forth in the Restatement

(Fourth) of Torts § 757, comment b, to determine whether or not information qualifies as a "trade

secret."  Those factors include:  (1) the extent to which the information is known outside the

business; (2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the

value of the information to the employer and to his competitors; (5) the amount of effort or

money expended by the employer in developing the information; and (6) the ease or difficulty

with which the information could be properly acquired or duplicated by others.[6]

This case involves two categories of trade secrets expressly protected by the CUTSA, *i.e.,*

---

[6] *See Nationwide Mut. Ins. Co. v. Stenger*, 695 F. Supp. 688, 691 (D. Conn. 1988) (citing *Holiday Food Co. v. Munroe*, 37 Conn. Supp. 546, 551, 426 A.2d 814, 817 (1981) and *Pressure Science, Inc. v. Kramer*, 413 F. Supp. 618, 626-27 (D. Conn.), *aff'd*, 551 F.2d 301 (2nd Cir. 1976)). The Court in *Stenger* observed that courts often consider the following additional factors: (a) the method by which the former agent acquired the alleged secret, and (b) the unfair advantage accruing to the former agent from the use of his former principal's alleged secret. *Id.* at 691.

ME1 6885073v.1

compilations of customer and prospect information and customer and prospect lists and contact information. There is no question that this information constitutes a trade secret under the facts of this case. First, the Confidential and Proprietary Information misappropriated by Defendants was not known or available to individuals outside of TDBIA. Specifically, Defendants misappropriated customer and prospect account information, including customers' names, addresses, telephone numbers, and names of principal owners and contact persons. While this information certainly would be in the possession of the customer, the compilation of information would not have been available to third parties unrelated to TDBIA (especially not in the manner compiled by TDBIA).

Second, TDBIA strictly limits access to the type of customer information misappropriated by Defendants. TDBIA maintains its customer information within its offices. Only those employees who require access to the information to perform their duties have access to the information. To the extent the customer information is in electronic form, TDBIA maintains a system of password protections that limit employees' access and completely prohibits any third party access to the information. Unless an employee has a specific need for the information and/or documents to service the individual customer, TDBIA employees would not have knowledge of the information.

Third, TDBIA takes all reasonable efforts to protect the information. The Company has a very strict confidentiality policy protecting customer information and requires employees—like Meeker and Bechard—to bind themselves to confidentiality agreements as a condition of employment. Further, TDBIA has a Code of Conduct and Ethics, which is readily available to the public and to customers, that confirms TDBIA's commitment to a very high standard of confidentiality for its customer information:

**A. Confidential Information Regarding Customers and Others.**
Persons must protect all information about customers, prospective customers, shareholders or suppliers, or their accounts, including but not limited to financial condition, business transactions, credit information and other business data in a manner consistent with applicable law and the Company's Privacy and Safeguarding of Customer Information Policies, as amended from time to time and any applicable confidentiality/non-disclosure agreement or arrangement.

**B. Safeguarding of Information.**
All information concerning Company customers, Persons and agents is considered confidential information. Even the fact that a customer has a banking relationship with the Company is confidential. Customer information must not be disclosed to any unauthorized party. In safeguarding customer information each Person must act in a manner consistent with applicable law and the Company's Privacy and Safeguarding of Customer Information Policies. Any questions regarding the Privacy or Safeguarding of Customer Information Policy should be directed to the Compliance Department.

**C. Permissible Dissemination of Confidential Information.**
Dissemination of confidential customer information among Company subsidiaries is permissible. Notwithstanding the foregoing, all queries of a legal nature that involve confidential information relating to a subsidiary's customers must be directed to the Legal Department.

*     *     *

**E. Company Resources; Proprietary Information.**
Persons are prohibited from selling, disclosing, or otherwise using the Company's physical resources or proprietary information for personal benefit or for the benefit of any other party. The definition of the Company's "physical resources or proprietary information" includes all the Company's intellectual property, including but not limited to any written materials, any computer or network-based information, data, any other types of information or data developed for the Company by an Employee or a vendor, supplier or other contractor of the Company.

Example: Employees are prohibited from using the Company's marketing research for a personal venture or disclosing proprietary information to a competitor.

Through strict enforcement of compliance with these policies, TDBIA ensures the integrity and confidentiality of Confidential and Proprietary Information.

Fourth, the Confidential and Proprietary Information that Meeker, Bechard, and Smith Bros. misappropriated would be extremely valuable to anyone seeking to provide the customer with surety bond or other insurance products and services. The customer information taken by Defendants includes everything that a competitor needs to solicit unfairly the business of

24

TDBIA's customers and to immediately act as a surety bond broker for the customer without the requisite start-up costs and other expenditures of time and resources. Indeed, using such information to their unfair economic advantage is exactly what Defendants did in this case.

Fifth, TDBIA has expended a significant amount of time and money compiling and maintaining the information misappropriated by Defendants. This information is the lifeblood of TDBIA's relationship and goodwill with its customers.

Sixth, a competitor would have significant difficulty in obtaining the information misappropriated by Defendants. Although some of the information, such as customer contact information could be obtained—if the competitor has the names of the customers—the specific and marketable customer information could not be readily compiled in a useful manner, as TDBIA has done, without the expenditure of significant amounts of time and resources.

All six factors demonstrate that the Confidential and Proprietary Information that Meeker, Bechard, and Smith Bros. misappropriated from TDBIA constitutes trade secret information under the CUTSA. Moreover, the manner in which Defendants obtained the information—*i.e.,* secretly misappropriating it during the course of their employment by, among other things, forwarding data to a personal email account—provides further support for a finding that the purloined information constitutes trade secrets.

In sum, Defendants "misappropriated" TDBIA's trade secrets as that term is defined by the CUTSA. CUTSA defines "misappropriation" to mean "disclosure or use of a trade secret of another without express or implied consent by a person who . . . (B) at the time of the disclosure or use knew or had reason to know that his knowledge of the trade secret was . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ." Conn. Gen. Stat. § 35-51(b). In this case, Meeker and Bechard lost all authority to possess or use TDBIA's trade secret information the moment that their employment ended. And, of course,

Meeker had absolutely no authority whatsoever to make use of the information in any way detrimental to TDBIA during the course of his employment.  Tellingly, Defendants have failed and refused to return any of TDBIA's trade secret information or other Confidential and Proprietary Information.

## CONCLUSION

For the foregoing reasons, TDBIA respectfully requests that the Court issue a temporary restraining order against Defendants, consistent with the accompanying proposed temporary restraining order.

_Robert Gallo_

_____
Robert J. Gallo (CT 19982)
McCARTER & ENGLISH, LLP
CityPlace I
185 Asylum Street
Hartford, CT  06103
(860) 275-6700

Eric J. Uhl
Louis B. Butterfield
MOSS SHAPIRO
400 Congress, P.O. Box 7250
Portland, ME 04112-7250
(207) 774-6001

Attorneys for Plaintiff
TD Banknorth Insurance Agency, Inc.

26